| | | |
|---|---|---|
| **TREVOR MOHAMMED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **KENNETH BEAVER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on initial review of *pro se* Plaintiff's Complaint, (Doc. No. 1). Plaintiff is proceeding *in forma pauperis*. (Doc. No. 5).

## I.     BACKGROUND

*Pro se* Plaintiff filed a civil rights suit pursuant to 42 U.S.C. § 1983, addressing incidents that allegedly occurred at the Alexander Correctional Institution where he still resides. He names as Defendants: Alexander C.I. Administrator Kenneth **Beaver**, Unit Manager Rondal **Townsend**, Medical Supervisor Pamela **Chapman**, Chronic Care Nurse Renee **Harris**, Nursing Supervisor C. **Fox**, Sergeant **Goins**, Correctional Officer **Snuffer**, NC DPS Medical Director Dora **Plummer**, NC DPS Director of Prisons Kenneth **Lassiter**, and NC DPS Secretary Erik **Hooks**.

Liberally construing the Complaint and accepting the allegations as true, Plaintiff has several medical problems and is "ADA-assigned." (Doc. No. 1 at 5).

On November 17, 2017, Plaintiff was transferred from Maury C.I. to Alexander C.I. "on retaliatory transfer." (Doc. No. 1 at 5). Prior to the transfer Plaintiff had medical appointments scheduled with outside providers for his shoulder injury, severe migraines, and neck surgery. Plaintiff addressed the issue verbally and in writing to supervisory staff including Defendants

1

Townsend and Beaver prior to the transfer and asked to be transferred back to the Eastern region or to Central Prison where it is convenient for friends to visit him, to no avail.

At Alexander C.I., Plaintiff "addressed violated acts that he was subjected to, and violations that he witnessed." (Doc. No. 1 at 5). For example, he saw Defendant Goins and his staff beat a mentally challenged inmate with batons and choke him unconscious. Plaintiff appears to allege that he wrote grievances and letters to "supervisory staff" including Defendants Hooks, Lassiter, and Plummer. Plaintiff was subjected to "further reprisal tactics and retaliatory acts" for exercising his First Amendment rights. (Doc. No. 1 at 5).

On December 15, 2017, Plaintiff was taken to Central Prison for a scheduled orthopedic appointment for a shoulder tear and limited use that remained after reconstructive surgery on his left shoulder. Because his neck surgery had been rescheduled they wanted to wait until after surgery and follow up in six months. However, Plaintiff was not taken to the follow-up appointment even though, on May 2018, medical provider James Johnson stated that he would reschedule the follow-up appointment.

On December 18, 2017, Plaintiff was taken to Duke Regional Hospital for pre-surgery but he was denied a urinal on the trip even though staff knew he was on water pills and had to use the bathroom often. He urinated in his clothes in full restraints in the van and had to sit in his wet clothes for an extended period during transit and processing back into the facility before he was allowed to clean himself, which caused a rash.

On February 13, 2018, Plaintiff was taken to Duke Regional Hospital for neck surgery. Afterwards he was taken to Central Prison Hospital where he was housed for approximately six weeks. He was not allowed to mail correspondences to friends or family because his ID card was taken from him when he left Alexander C.I. on February 13, 2018, and Alexander C.I. "staff"

failed to send the card to him at Central Prison despite many requests and even though Alexander transportation staff go to Central Prison almost every day. (Doc. No. 1 at 7). An ID card is needed to purchase postage stamps or obtain indigent postage.

Plaintiff's personal items including prison ID card, wristwatch, sunglasses and religious headgear are always taken from him before he leaves Alexander C.I. The headgear would keep Plaintiff, who is bald, warm in cold temperatures because there is no heat in the rear of the handicapped vans. Plaintiff was not subjected to this condition at other facilities. Transportation staff wear hats, sunglasses, watches, and have personal cell phones.

On March 29, 2018, Plaintiff was transported back to Alexander C.I. from Central Prison Hospital and was immediately subjected to retaliation. Staff including Defendants Townsend and Beaver failed to honor a medical order for housing in a handicapped cell. He was housed in a small cell that was not handicap accessible, had no outlet to plug in his "breathing machine." (Doc. No. 1 at 7). There not enough space for Plaintiff to turn his wheelchair so Plaintiff had to back up his wheelchair which took several attempts because Plaintiff could not turn his head. Plaintiff fell on two occasions while getting up from the toilet which hurt his wrist. Plaintiff also had a medical order for assistance from an orderly which was valid until January 19, 2020, but it has not been honored since Plaintiff returned from neck surgery. He is forced to solicit assistance from other inmates and often has to forego meals when he cannot get help.

On March 30, 2018, the day after Plaintiff was transported back to Alexander C.I., Sergeant Goins asked whether Plaintiff was allowed to wear his neck brace. Officer Snuffer ordered Plaintiff to take his neck brace to the "Treatment Room." (Doc. No. 1 at 8). When Plaintiff arrived there, Nurse Smitty told the male nurse to check Plaintiff's brace. Plaintiff asked the reason for taking it and Nurse Smitty stated that Dr. Kalinski discontinued it and told her to take it. A titanium brace

and screws were inserted into Plaintiff's neck along with a bone graft, which the surgeon said takes about six months to attach.

Later that day, Sergeant Goins discovered that Plaintiff had a foam neck brace for sleeping and wanted to know why Nurse Smitty had not taken it. A short time later, Officer Snuffer instructed Plaintiff to take his foam brace to the treatment room. Nurse Smitty came out and told Plaintiff that Dr. Kalinski had told her to take the foam brace. Plaintiff realized that Dr. Kalinski was not working that day and challenged Smitty, who changed her statement and said that Dr. Kalinski had discontinued both braces the prior day. Assuming Dr. Kalinski had worked the prior day, the doctor would have already left for the day when Plaintiff returned to Alexander at around 18:00 hours. Plaintiff explained that his life and health were at risk and asked to speak to supervisory medical staff. Sergeant Goins called Captain Maynor. Sergeant Goins and Nurse Smitty stepped out of the room for a few minutes and when they returned, Smitty reported that the "supervisor, or lead nurse"[1] said that Plaintiff could keep the soft brace. (Doc. No. 1 at 9). Plaintiff never saw or spoke to Dr. Kalinski during the entire period he was housed at Alexander C.I. Sergeant Goins is known for confiscating medically-issued items and Alexander C.I.'s nursing staff usually support his wrongful conduct.

On May 7, 2018, Plaintiff was taken to Duke Regional Hospital for a follow-up appointment with his surgeon, but the surgeon would not see Plaintiff because Alexander medical staff did not send an x-ray of Plaintiff's neck, which had been requested in writing. An additional request for an x-ray was sent to Alexander medical staff and an x-ray was finally taken but Plaintiff was not taken back to see the surgeon.

---

[1] It is unclear whether Plaintiff is referring to Defendant Fox.

Alexander's medical provider, James Johnson, told Plaintiff that the x-ray showed the hardware in his neck is loose, which supported his complaint that it felt like something was sticking him in the neck, and neck and shoulder pain that had become more severe. "Staff" ignored medical orders and implemented/enforced obstacles to prevent Plaintiff from going on trips to be treated for his neck injury. (Doc. No. 1 at 10). Since the x-ray results, Transportation Officer Burgess is always assigned to transport Plaintiff. She uses cuffs that are small and tight on him and stacks his arms over each other about seven inches apart with a black box between them that is attached to a waist chain. This is inconvenient and causes much more pain in his neck/shoulders. Plaintiff wears an arm sling, and the restraints prevent him from using his inhaler or urinal. Burgess refuses to give him a urinal, stating he does not have an order for a urinal. Even though Plaintiff had previous orders relating to cuffs/restraints, on May 29, 2018, another order was written that addresses stacking: "Please do not over adduct arm cuff" (Doc. No. 1 at 10). On June 8, 2018, Officer Burgess ignored medical orders to prevent Plaintiff from going to see his surgeon to be treated for his neck injury. On August 28, 2018, Plaintiff had an outside trip to ECU for his migraines. This time, Burgess did not stack his arms and she gave him a urinal, but she still used small cuffs that caused bruises. She did not give him much room with the waist chain so instead of using his inhaler upright, he had to bend over to use it sideways. He had to stay in the small cuffs for approximately 12 hours even though he repeatedly said they were tight. When he returned, "the nurse" saw the bruises on his arms and imprint from the small cuffs but told him to submit a sick call request. (Doc. No. 1 at 11). To date the request has been unaddressed.

Many of Plaintiff's sick call requests were not processed. The couple of times he has been seen, nothing was done. He was referred to providers but never saw them. Additionally, his confidential medical information was discussed in the presence of non-medical staff, *i.e.*,

correctional officers.

On December 21, 2017, Plaintiff was summoned to the treatment room for sick call. He was kept there for an extended period while Nurse Harris had Officers Duncan and Martin search his cell.

On September 15, 2018, Plaintiff declared a medical emergency due to a rash on his thigh/groin area that was painful and burning, which he probably got from a shower chair. A nurse said it was shingles and that he would be seen by a provider. He was given anti-viral pills for seven days. The problem became worse with "infection and leakage" but "medical staff" continuously refused to see him even though Defendant Townsend, Corley and Sims spoke to medical staff on Plaintiff's behalf. (Doc. No. 1 at 11).

Plaintiff has a valid order for overhead headphones to fit over his hearing aids. Defendants Harris, Fox, and Chapman continuously refuse to provide overhead headphones.

Certain information, items, restrictions were removed from Plaintiff's medical records ("Medical Duty Status"). (Doc. No. 1 at 12). On information and belief, they were deceptively "erased/changed" by Defendants Harris and Fox. (Id.).

On August 15, 2018, Plaintiff signed a form for release of his medical information to a private citizen. When that person contacted Defendant Plummer, she was told that Plaintiff did not fill out any such form. Plaintiff asked Alexander staff including Nurse Johnson, to whom he had given the form, and he was told it was put in a box for Defendant Fox. He asked for another form but Nurse Smitty said that Defendant Fox said he could only get the form from the medical director. On September 7, 2018, he was given another form which he filled out with the name of the person to whom the information can be released and his signature. "The nurse" stated that they would fill out the rest of the form. Plaintiff went along in good faith but is not comfortable with it and has

not heard anything with regards to it. (Doc. No. 1 at 12).

On May 4, 2018, Plaintiff submitted a grievance about why his medical records were secretly/deceptively changed, and the denial of medical items in violation of ADA requirements. Plaintiff's grievance was not accepted until May 9, which is more than the three calendar days provided by policy. On May 9, further changes were made on Plaintiff's "Medical Duty Status" sheet stating that Plaintiff has no restrictions and egg crate for bed, handicap cell, and orderly assistance were removed. (Doc. No. 1 at 13). Two days later, his cell was vandalized and property was wrongfully confiscated, including "medically issued item." (Doc. No. 1 at 13).

On May 11, 2018, while Plaintiff was in the dayroom, an inmate informed him that Duncan and Defendant Snuffer were in his cell "tearing it up." (Doc. No. 1 at 13). Plaintiff went to see what was going on and Duncan threatened to mace him. They vandalized his cell, scattered his property across the floor and bed, and confiscated personal properly including "medically issued item," some of which was returned days later. (Doc. No. 1 at 13).

On June 28, 2018, between 8:00 and 9:00 AM, Plaintiff was awakened by Officer Anderson who stated he wanted to check the cell for clothes. When Plaintiff got to the door Anderson walked away and Snuffer (who had been standing out of sight) entered the cell and started throwing personal property on the floor. Defendant Townsend overheard Plaintiff's statement that Defendant Snuffer was supposed to be looking for clothes but was taking everything else, and Defendant Townsend told Defendant Snuffer to come with him and they left the dorm. Plaintiff's cell was left a mess with property and food scattered everywhere.

On June 28, 2018 between 18:00 and 19:00 hours, Officer Anderson came and searched Plaintiff's cell. Plaintiff saw Defendant Snuffer standing at the side out of sight and asked to speak to a supervisor to get someone else to search his cell, but Defendant Snuffer said he was assigned

to search Plaintiff's cell and threatened him with an infraction. Defendant Snuffer displayed "vengeance" and again scattered food items and property across the floor. (Doc. No. 1 at 14). Plaintiff was not allowed to witness the entire search because he was taken outside to the metal detector. When he returned he observed Defendant Snuffer reading his legal materials and scattering them. As Plaintiff was arguing about bags of cereal thrown on the floor that Defendant Snuffer stepped on, Defendant Townsend peeped into the cell and saw the cereal on the floor so Plaintiff addressed the issue to him. Defendant Townsend sarcastically stated that Plaintiff was not supposed to have food in his cell. When Plaintiff asked why, Defendant Townsend said that Plaintiff gets three meals in the dining hall. The cell was left in a mess with property and food scattered everywhere. The Quran was on the floor under the toilet and "many things were wrongfully confiscated." (Doc. No. 1 at 14).

The previous day, June 27, Defendant Snuffer was peeping into Plaintiff's cell, Plaintiff believes, to "scop[e] out the scenery" to come back and do a search the following day. (Doc. No. 1 at 15). That same day, Defendant Snuffer posted memos in each dorm saying conjugal visits would be allowed but it turns out that Defendant Snuffer and Duncan were playing games.

Legal mail is often held for more than 24 hours without legitimate reason and pieces were opened outside Plaintiff's presence. Alexander "mailroom staff" failed to log Plaintiff's outgoing package which is unaccounted for. (Doc. No. 1 at 15).

Plaintiff filed grievances and letters to Defendants Hooks, Lassiter, Plummer, and Beaver in good faith attempts to solve these problems to no avail.

Plaintiff seeks declaratory judgment, preliminary and permanent injunction, compensatory and punitive damages, a jury trial, costs, and any additional relief the Court deems just, proper and equitable.

## II.  PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy that is never awarded as of right. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013).  In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987).  To obtain a preliminary injunction, a plaintiff must establish (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  Winter, 555 U.S. at 20; Di Biase v. SPX Corp., 872 F.3d 224, 229 (4th Cir. 2017).

Plaintiff conclusively states that the lack of preliminary injunctive relief will cause him irreparable injury. However, Plaintiff has failed to establish a reasonable likelihood of prevailing on the merits or that she is likely to suffer irreparable harm in the absence of preliminary relief. Therefore, preliminary injunctive relief will be denied.

## III.  STANDARD OF REVIEW

Because Plaintiff is a prisoner proceeding *in forma pauperis*, the Court must review the Complaint to determine whether it is subject to dismissal on the grounds that it is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).  In its frivolity review, a court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989).  A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as

true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

A *pro se* complaint must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where … there is a *pro se* complaint raising civil rights issues."). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990). A *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983). This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). He must articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief. Id.

## IV.    DISCUSSION

**(1)    Individuals Not Named as Defendants**

The Federal Rules of Civil Procedure provide that, "[i]n the complaint the title of the action shall include the names of all the parties." Fed. R. Civ. P. 10(a); see Myles v. United States, 416 F.3d 551 (7th Cir. 2005) ("to make someone a party the plaintiff must specify him in the caption

and arrange for service of process."). Although *pro se* litigants are entitled to have their pleadings liberally construed, Haines, 404 U.S. at 520, "[d]istrict judges have no obligation to act as counsel or paralegal to pro se litigants," Pliler v. Ford, 542 U.S. 225 (2004).

The body of the Complaint contains allegations against individuals who are not named as defendants in the caption as required by Rule 10(a). This failure renders Plaintiff's allegations against them nullities. See, e.g., Londeree v. Crutchfield Corp., 68 F.Supp.2d 718 (W.D. Va. Sept. 29, 1999) (granting motion to dismiss for individuals who were not named as defendants in the compliant but who were served). These claims will therefore be dismissed without prejudice.

**(2)     Cruel and Unusual Punishment**

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The Constitution "does not mandate comfortable prisons, … but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Thus, prison official must provide sentenced prisoners with adequate food, clothing, shelter, and medical care, and "take reasonable measures to guarantee the[ir] safety…." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984); see Farmer, 511 U.S. at 832-34. Inmates' claims that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir.1987). To establish the imposition of cruel and unusual punishment, a prisoner must prove two elements: (1) "the deprivation of [a] basic human need was objectively sufficiently serious," and (2) "subjectively the officials act[ed] with a sufficiently

culpable state of mind." <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995) (quoting <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir.1993) (quotation omitted).

    **(a)**        **<u>Medical Deliberate Indifference</u>**

To state a *prima facie* case of deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. <u>Heyer v. United States Bureau of Prisons</u>, 849 F.3d 202, 210 (4th Cir. 2017) (citing <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko</u>, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. However, mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852.

Plaintiff alleges that he has serious medical conditions including shoulder injury, severe migraines, and neck surgery.

Plaintiff makes a number of general claims with regards to his medical treatment. He alleges that "medical staff" and "nurse[s]" refused to carry out prescribed orders for handicap cell, orderly assistance, restraints, and overhead headphones, that a nurse deceptively changed his provider's orders, that there was a deliberate failure to process submitted sick call requests, that x-rays were not taken by medical staff for an outside medical appointment, and that a follow-up appointment was never scheduled. Plaintiff also alleges that the viral medication he received for a rash on his thigh on September 15, 2018, was insufficient and that "medical staff" refused to see

him again even though correctional officers spoke to medical on his behalf. (Doc. No. 1 at 11). These general allegations fail to factually support a deliberate indifference claim against any of the named Defendants and therefore will be dismissed without prejudice. <u>See</u> Fed. R. Civ. P. 8(a)(2) (short and plain statement is required); <u>Simpson v. Welch</u>, 900 F.2d 33, 35 (4th Cir. 1990) (conclusory allegations, unsupported by specific allegations of material fact are not sufficient); <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 201-02 (4th Cir. 2002) (a pleader must allege facts, directly or indirectly, that support each element of the claim).

Plaintiff alleges more specifically that Defendants Goins and Snuffer were deliberately indifferent with regards to the confiscation of his neck brace. Defendant Goins, a correctional sergeant, questioned whether Plaintiff was allowed to wear his neck brace when he returned from surgery on March 30, 2018, and Defendant Snuffer, a correctional officer, instructed Plaintiff to take his neck brace to the "Treatment Room" where the brace was confiscated by medical staff. Plaintiff claims that Defendant Goins is known for confiscating medically-issued items and that Alexander C.I.'s nursing staff usually support his wrongful conduct.[2] Plaintiff fails to sufficiently allege that Goins and Snuffer, who are not medical staff, knew that Plaintiff had a serious medical need and that their actions of referring Plaintiff to medical for approval of the brace had a substantial risk of seriously harming him. Neither of these Defendants allegedly confiscated the brace; referring Plaintiff to medical to determine whether the brace was authorized fails to state a claim for deliberate indifference against these non-medical personnel. <u>See Arnett v. Webster</u>, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants … can rely on the expertise of medical personnel.").

---

[2] To the extent that Plaintiff attempts to assert any claims on behalf of other prisoners, they are dismissed. <u>See Hummer v. Dalton</u>, 657 F.2d 621, 625 (4th Cir. 1981) (prisoner's suit is "confined to redress for violations of his own personal rights and not one by him as knight-errant for all prisoners.")

Plaintiff alleges that Defendants Harris and Fox removed certain information, items, and restrictions from his medical records to deceptively reflect untruth. This allegation appears to refer to the order for overhead headphones to fit over Plaintiff's hearing aids that Defendants Harris, Fox, and Chapman allegedly refused to provide. See (Doc. No. 1 at 12). Assuming that a claim for inaccurate medical records is cognizable under § 1983, Plaintiff's allegations are too vague and conclusory to proceed because Plaintiff fails to allege that Defendants Harris and Fox knew that their actions had a substantial risk of seriously harming Plaintiff. Therefore, Plaintiff's medical deliberate indifference claims will be dismissed.

**(b)** **Conditions of Confinement**

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297-99 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission ... result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298 (citing Rhodes, 452 U.S. at 347).

Plaintiff alleges that he was denied a urinal on one medical trip which caused his to urinate on himself which was humiliating and caused a rash. Next, Plaintiff alleges that his prison ID card and approved religious headgear are always confiscated before medical trips even though prison staff have wristwatches, sunglasses, hats, and personal cell phones. Plaintiff alleges that his headgear would help him keep warm in back of the unheated transportation van. He was without his prison ID for approximately six weeks while he was at Central Prison Hospital following neck surgery. He was unable to buy stamps or obtain indigent postage without his ID and he was

consequently prevented from sending mail to friends and family during that time. Plaintiff also alleges that he was deprived of the assistance of an orderly for which he had a medical order. These allegations are not sufficiently serious to have denied Plaintiff the minimum necessities of life. Nor are these alleged deprivations factually linked to the named Defendants.

Plaintiff also alleged that, when he returned to Alexander C.I. after his neck surgery, Townsend and Beaver refused to honor the medical order for a handicap cell and housed him in a small non- handicap accessible cell that had no outlet to plug in his breathing machine and lacking adequate space to turn around his wheelchair. As a result he had to back up his wheelchair, which took several attempts because Plaintiff could not turn his head. He fell on two occasions while getting up from the toilet which hurt his wrist. This claim is not clearly frivolous and will be permitted to proceed.

Therefore, Plaintiff's claim about unconstitutional conditions of confinement will be permitted to proceed against Defendants **Townsend** and **Beaver** but the remaining claims will be dismissed.

**(3)**   **ADA**

Under Title II of the ADA, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. See Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131(2). A reasonable modification does not require the public entity to employ any and all means to make services available to persons with

disabilities. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." <u>Miller v. Hinton</u>, 288 Fed. Appx. 901, 902 (4th Cir. 2008) (quoting <u>Bircoll v. Miami-Dade County</u>, 480 F.3d 1072, 1082 (11th Cir. 2007)).

Plaintiff claims that Defendants refused to carry out prescribed orders for handicap cell, orderly assistance, restrains, overhead headphones, deceptively changed provider's orders, deliberately failed to process submitted sick call requests, failed to provide headphones, failed to reschedule an appointment for treatment, and confiscated his neck braces. Plaintiff appears to allege that confiscation of the neck brace and lack of a follow-up appointment caused loose metal screws in his neck, and that he fell on two occasions in the non-handicap cell.

The gist of Plaintiff's allegations is that Defendants failed to attend to his medical needs. However, he does not appear to argue that any of the foregoing was done due to discrimination based on his alleged disability. He has, therefore, failed to state a claim under the ADA. <u>See</u> <u>Bryant v. Madigan</u>, 84 F.3d 246, 249 (7th Cir. 1996) (holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners…."); <u>Rashad v. Doughty</u>, 4 Fed. Appx. 558, 560 (10th Cir. 2001) (stating that "[t]he failure to provide medical treatment to a disabled prisoner, while raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation."). Therefore, Plaintiff's ADA claims will be dismissed.

**(4)**     **<u>Equal Protection</u>**

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The equal protection requirement "does not take from the States all power of classification," <u>Personnel Adm'r v. Feeney</u>, 442 U.S. 256, 271 (1979), but "keeps governmental

16

decisionmakers from treating differently persons who are in all relevant respects alike." <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992). To succeed on an equal protection claim, a § 1983 plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." <u>Morrison v. Garraghty</u>, 239 F.3d 648, 654 (4th Cir. 2001). If he makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." <u>Id.</u> Ordinarily, when a state regulation or policy is challenged under the Equal Protection Clause, unless it involves a fundamental right or a suspect class, it is presumed to be valid and will be sustained "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." <u>Heller v. Doe</u>, 509 U.S. 312, 319–320 (1993). The Fourth Circuit does not recognize prisoners as "a suspect class." <u>Roller v. Gunn</u>, 107 F.3d 227, 233 (4th Cir. 1997). When equal protection challenges arise in a prison context, however, courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner. <u>See</u> <u>Morrison</u>, 239 F.3d at 654–55. In a prison context, therefore, the court must determine whether the disparate treatment is "reasonably related to [any] legitimate penological interests." <u>Shaw v. Murphy</u>, 532 U.S. 223, 225 (2001). This deferential standard applies "even when the alleged infringed constitutional right would otherwise warrant higher scrutiny;" however, this more deferential review does not ignore the concerns that justify application of a heightened standard outside of the prison context. <u>Morrison</u>, 239 F.3d at 655-56.

Plaintiff appears to allege that Defendants violated equal protection by refusing to carry out doctors' orders for a handicap cell, orderly assistance, restrains, overhead headphones, deceptively changing his provider's orders, deliberately failing to process sick call requests, confiscating his neck braces, and refusing to reschedule an appointment for treatment.

Plaintiff conclusively states that Defendants violated equal protection, however, he does not explain how any similarly situated prisoners are treated differently or how the allegedly unequal treatment was the result of intentional or purposeful discrimination. Therefore, Plaintiff's equal protection claim is insufficient to proceed and will be dismissed.

**(5)**     <u>**Search and Seizure**</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. Amend. IV. The applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." <u>Hudson v. Palmer</u>, 468 U.S. 517, 525 (1984) (quoting <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979)). While "imprisonment carries with it the circumscription or loss of many significant rights," the Supreme Court nevertheless cautioned that "prisons are not beyond the reach of the Constitution." <u>Id.</u> at 523–24.

A prisoner thus retains "some legitimate expectation of privacy in his person" under the Fourth Amendment. <u>See</u> <u>King v. Rubenstein</u>, 825 F.3d 206, 214–15 (4th Cir. 2016). The Supreme Court has "developed a flexible test to determine the reasonableness of a broad range of sexually invasive searches...." <u>United States v. Edwards</u>, 666 F.3d 877, 883 (4th Cir. 2011) (citation and internal quotation marks omitted); <u>see</u> <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979). The following factors determine the reasonableness of the search: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." <u>Wolfish</u>, 441 U.S. at 559. Searches conducted "in an abusive fashion … cannot be condoned." <u>Id.</u> at 560. The deference afforded to prison administrators "does not insulate from review actions taken in bad faith and for no legitimate purpose." <u>Williams v. Benjamin</u>, 77 F.3d 756, 765 (4th Cir.

1996) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 322 (1986)). However, society does not "recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and …, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." <u>Hudson</u>, 468 U.S. at 525.

To the extent that Plaintiff alleges he had a right to privacy in his cell or that prison officials somehow violated the Fourth Amendment by conducting cell searches, he has failed to state a § 1983 claim.

**(6)**    <u>**Mail**</u>

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech…." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment. <u>See</u> <u>Everson v. Bd. of Educ.</u>, 330 U.S. 1, 15 (1947). A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974); <u>Pittman v. Hutto</u>, 594 F.2d 407, 410 (4th Cir. 1979). When a prison restriction infringes upon an inmate's First Amendment rights, the alleged infringement "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." <u>Bell</u>, 441 U.S. at 547 (citing <u>Jones v. N.C. Prisoners' Labor Union</u>, 433 U.S. 119, 129 (1977)).

As a general rule, prisoners have a constitutionally protected interest in their incoming and outgoing mail correspondence. <u>Kaufman v. McCaughtry</u>, 419 F.3d 678, 685 (7th Cir. 2005) (citing <u>Rowe v. Shake</u>, 196 F.3d 778, 782 (7th Cir. 1999) (citations omitted)). Persons outside of prison also have an interest in corresponding with prison inmates. <u>See</u> <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 408 (1989). Prison officials may, however, impose restrictions on prisoner correspondence if

those restrictions are "reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987). When evaluating the constitutionality of prison regulations, courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Bell</u>, 441 U.S. at 547 (citations omitted).

On February 13, 2018, Plaintiff was taken to Duke Regional for neck surgery. Afterwards he was taken to Central Prison Hospital where he was housed for approximately six weeks. He was not allowed to mail correspondences to friends or family because his ID was taken from him when he left Alexander C.I. on February 13, 2018, and "AXCI staff" failed to send the card to him at Central Prison despite many requests, even though Alexander transportation staff go to Central Prison almost every day. (Doc. No. 1 at 7). An ID card is needed to purchase postage stamps or obtain indigent postage. He also alleges that legal mail is often held for more than 24 hours without legitimate reason, that pieces of mail were opened outside Plaintiff's presence, and that Alexander C.I. mailroom staff failed to log Plaintiff's outgoing package which is unaccounted for.

Plaintiff fails to adequately allege that any of the Defendants were involved in the disruption to his mail in either their personal or supervisory capacities. Therefore, Plaintiff's claims with regards to the mail will be dismissed.

## (7)  <u>Due Process</u>

The Fourteenth Amendment's Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. The first inquiry in any due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty that was accomplished by state action. <u>Tigrett v. Rector and Visitors of the Univ. of Va.</u>, 290 F.3d 620, 628 (4th Cir. 2002); <u>Stone v. Univ. of Md. Med. Sys. Corp.</u>, 855

F.2d 167, 172 (4th Cir. 1988). "Unless there has been a 'deprivation' by 'state action,' the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." Stone, 855 F.2d at 172.

**(a)** **Property**

Where a state employee's random, unauthorized act deprives an individual of property, either negligently or intentionally, the individual is relegated to his state post-deprivation process, so long as the State provides an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)). However, post-deprivation remedies do not satisfy the due process requirement where the deprivation complained of is effected pursuant to an established state procedure rather than a random, unauthorized action. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).

Under North Carolina law, an action for conversion will lie against a public official who wrongfully deprives an owner of his property by an unauthorized act. Gallimore v. Sink, 27 N.C.App. 65, 67, 218 S.E.2d 181, 182 (1975). North Carolina's post-deprivation remedies are adequate. N.C. Gen. Stat. § 143-291; see Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983) (due process satisfied where North Carolina tort law provides an adequate avenue for relief for state prisoner).

Plaintiff alleges that his cell was searched and that property was scattered and wrongfully seized without justification and contrary to DPS policy. It appears that the alleged loss of Plaintiff's property was random and unauthorized rather than the result of an established state procedure. Adequate post-deprivation remedies exist for Plaintiff's alleged property loss, so there is no legal

21

theory which would support this claim. See, e.g., Smith v. Ledford, 2006 WL 1431666 at *2 (W.D.N.C. May 22, 2006), aff'd, 203 Fed. Appx. 484 (4th Cir. 2006) (dismissing plaintiff's claim that jail administrator confiscated his personal property upon his departure from the jail and refused to return it, because plaintiff had an adequate post-deprivation remedy for conversion). Therefore, this claim will be dismissed.

### (b) **Grievances**

"[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). A prisoner's "access to and participation in the prison's grievance process are not constitutionally protected…." Taylor v. Lang, 483 Fed. Appx. 855, 857 (4th Cir. 2012).

Plaintiff alleges that he submitted grievances that were denied at the institution level and on appeal, and resulted in no relief. To the extent that Plaintiff suggests that the denial of his grievances or lack of remedies denied him of his constitutional rights, this claim will be dismissed as frivolous because there is no right to a prison grievance procedure.

## (8) **HIPAA**

The Health Insurance Portability and Accountability Act ("HIPPA") establishes standards and regulations intended to protect the privacy and accuracy of medical records. 42 U.S.C. § 1320d et seq. It does not, however, provide a private right of action for any citizen. See Garmon v. Cnty. of Los Angeles, 828 F.3d 837 (9th Cir. 2016); Dodd v. Jones, 623 F.3d 563 (8th Cir. 2010); Wilkerson v. Shinseki, 606 F.3d 1256 (10th Cir. 2010); Miller v. Nicholas, 586 F.3d 53 (1st Cir. 2009); Acara v. Banks, 470 F.3d 569 (5th Cir. 2006).

Construing the Complaint liberally, it appears that Plaintiff attempts to state a claim under HIPAA for failure to disclose his medical records to a third party pursuant to his request, and for

discussing his confidential medical information in front of non-medical staff. Petitioner alleges that he signed a form for the release of his medical information to a private citizen, gave it to Defendant Fox, and Defendant Plummer subsequently denied Plaintiff having filled out the form. Plaintiff alleges that he filled out the form a second time and submitted it to a nurse but he is not comfortable with the procedure and has not heard anything about it. He also alleges that his confidential medical information was discussed in front of non-medical officers. Given that Plaintiff is attempting to assert a claim based on a non-existent private cause of action, he fails to state a plausible claim under § 1983. See Twombly, 550 U.S. at 555, 570; see, e.g., Wilson v. S. Health Partners Nursing Staff, 2018 WL 1972716 at *3 (W.D.N.C. Apr. 26, 2018).

**(9)** **Retaliation**

Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1987). To succeed on such a claim, a plaintiff must first allege that "the retaliatory act was taken in response to the exercise of a constitutionally protected right...." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Thereafter, a plaintiff must demonstrate that he suffered some adverse impact or actual injury. See American Civil Liberties Union of Maryland, Inc. v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993) (citing Huang v. Board of Governors of Univ. of North Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990)). In addition, a plaintiff must come forward with specific evidence "establish[ing] that but for the retaliatory motive the complained of incident[s] ... would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.1995); accord Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir.1991) (plaintiff must show that action would not have occurred "but for" the alleged reprisal); Collinson v. Gott, 895 F.2d 994, 1002 (4th Cir. 1990) (Phillips, J., concurring); McDonald v. Hall, 610 F.2d 16, 18–19 (1st Cir.1979). In the prison context, such claims are treated with skepticism because "[e]very act

of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." <u>Adams</u>, 40 F.3d at 74.

A prisoner does not have a federally protected liberty interest in any particular housing or classification unless it exceeds the scope of his original sentence and imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. See <u>Sandin v. Conner</u>, 515 U.S. 472 (1995). "[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges … are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and efficiently." <u>Gaston v. Taylor</u>, 946 F.2d 340, 343 (4th Cir. 1991) (*en banc*). As a general matter, a criminal defendant has no basis for complaint when he is transferred from one institution to another; the fact that life in one prison might be more disagreeable than in another is alone insufficient to warrant due process protections. <u>Meachum v. Fano</u>, 427 U.S. 215 (1976); <u>see</u> <u>Montanye v. Haymes</u>, 427 U.S. 236 (1976) (the due process clause does not require hearings in connection with transfers, whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive). However, transfers may be judicially challenged when they are retaliatory or are used as a means of punishing the exercise of constitutional freedoms. <u>See</u> <u>Montanye</u>, 427 U.S. at 242. To successfully argue retaliatory transfer in violation of his constitutional rights pursuant to § 1983, a plaintiff "must prove that a desire to retaliate was the actual motivating factor behind the transfer." <u>Goff v. Burton</u>, 91 F.3d 1188, 1191 (8th Cir.1996). In other words, the plaintiff must prove that but for his protected First Amendment activity, he would not have been transferred. <u>Rouse v. Benson</u>, 193 F.3d 936, 940 (8th Cir. 1999).

Plaintiff alleges that he was subjected to "reprisals and retaliatory acts" for exercising his First Amendment rights by writing grievances and letters to Defendants Hooks, Lassiter, and Plummer. (Doc. No. 1 at 5). These vague and conclusory allegations fail to state a retaliation claim because he does not explain how these Defendants retaliated against him for exercising his First Amendment rights, or how he was actually injured as a result.

Plaintiff also appears to allege that, after he submitted grievances, his Medical Duty Status was changed by Defendants Harris and Fox, and his cell was repeatedly vandalized and items were taken by Defendant Snuffer. Although Plaintiff alleges that Defendant Townsend witnessed some of Snuffer's cell searches, he fails to allege any connection between the grievance and Townsend's actions. Therefore, this claim is sufficient to proceed against Defendants Harris, Fox, and Snuffer, but fails to state a claim against Defendant Townsend.

Plaintiff further alleges that, on November 17, 2017, he was transferred from Maury C.I. to Alexander C.I. "on retaliatory transfer" which caused him to miss scheduled medical appointments. (Doc. No. 1 at 5). He objected to Townsend and Beaver prior to the transfer and asked to be transferred back to the Eastern region or Central Prison, but that never occurred. This claim is insufficient to proceed. Although Plaintiff alleges that his transfer to Alexander C.I. was retaliatory, he fails to explain any factual circumstances surrounding that transfer that made it retaliatory or how any of the Defendants were involved in the transfer decision. Nor does he explain how the rejection of his request to return to the Eastern region or Central Prison, where it would be more convenient for him to receive visits, was actually motivated by any First Amendment activity or caused him any actual injury. Therefore, Plaintiff's claim of retaliatory transfer will be dismissed.

Therefore, Plaintiff's retaliation claims will be permitted to proceed against Defendants **Fox, Harris,** and **Snuffer**, and the remaining retaliation claims will be dismissed.

**(10)** <u>**Privacy**</u>

"[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion." <u>Griswold v. Connecticut</u>, 381 U.S. 479, 483 (1965). The right to privacy includes an "individual interest in avoiding disclosure of personal matters." <u>Whalen v. Roe</u>, 429 U.S. 589, 599 (1977). However, this privacy interest must be weighed against the public interest in rehabilitation and in the security of prisons. <u>Taylor v. Best</u>, 746 F.2d 220, 224 (4th Cir. 1984). Prisoners do not have a constitutional right to complete confidentiality of medical records. <u>Powell v. Schriver</u>, 175 F.3d 107, 112 (2d Cir. 1999) (acknowledging that prison officials can impinge on a prisoner's right to maintain the confidentiality of previously undisclosed medical information "to the extent that their actions are reasonably related to legitimate penological interests") (internal quotation marks omitted).

Plaintiff alleges that his confidential medical information was discussed in the presence of non-medical staff, *i.e.*, correctional officers. These allegations are too vague and conclusory to proceed in that Plaintiff does not identify the Defendant or Defendants who allegedly violated his right to privacy or describe the circumstances under which such violation allegedly occurred. Therefore, to the extent that Plaintiff attempts to state a First Amendment privacy claim with regards to disclosure of his medical information to correctional officers, this claim will be dismissed.

## V. CONCLUSION

For the reasons stated herein, the Complaint is sufficient to proceed against Defendants

Beaver and Townsend for unconstitutional conditions of confinement, and against Defendants Fox, Harris, and Snuffer for retaliation. The remaining claims are dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

**IT IS THEREFORE ORDERED** that:

1. Plaintiff's § 1983 claims against Defendants **Beaver** and **Townsend** for unlawful conditions of confinement, and against **Fox, Harris,** and **Snuffer** for retaliation survive initial review under 28 U.S.C. § 1915.

2. The remaining claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

3. The Motion for Preliminary Injunction that is contained in the Complaint is **DENIED**.

4. **IT IS FURTHER ORDERED THAT** the Clerk of Court shall commence the procedure for waiver of service as set forth in Local Rule 4.3 for Defendants Beaver, Fox, Harris, Snuffer, and Townsend, who are current or former employees of NC DPS.

Signed: November 30, 2018

Frank D. Whitney
Chief United States District Judge