**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL CASE NO. 5:18-cv-00165-MR**

| | | |
|---|---|---|
| **TREVOR MOHAMMED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **KENNETH BEAVER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Partial

Summary Judgment [Doc. 62] and Defendants' Motion for Summary

Judgment [Doc. 67].

**I.     BACKGROUND**

The incarcerated Plaintiff Trevor Mohammed, proceeding *pro se*, filed

this action pursuant to 42 U.S.C. § 1983 addressing various incidents that

allegedly occurred at the Alexander Correctional Institution.[1]  The Complaint,

which the Plaintiff verified under penalty of perjury, passed initial review on

several claims.  [Doc. 1: Complaint; Doc. 7: Initial Review of Complaint].  The

_____

[1] The Plaintiff is currently incarcerated at the Pender Correctional Institution.

Plaintiff then filed an Amended Complaint in which he named as Defendants:[2] Erik A. Hooks, the secretary of the North Carolina Department of Public Safety ("NCDPS"); Kenneth Lassiter, NCDPS director of prisons; Kenneth Beaver, warden of the Alexander C.I.; Rondal Preston Townsend, a housing unit manager at Alexander C.I.; Pamela Chapman and Christina Fox, nurse supervisors at Alexander C.I.; Renee B. Harris, a nurse clinician at Alexander C.I.; Dora Plummer, a nurse at Alexander C.I.; Dustin Goins, a correctional sergeant at Alexander C.I.; and Brent C. Snuffer, a correctional officer at Alexander C.I. The Amended Complaint is not verified under penalty of perjury.

The Amended Complaint passed initial review on claims of deliberate indifference to serious medical needs, unconstitutional conditions of confinement, and retaliation.[3] [Doc. 19: Initial Review of Am. Complaint].

Now the Plaintiff has moved for partial summary judgment on the claim of "unreasonable searches and unjustifiable seizure of personal property" by Defendant Snuffer "and others" [Doc. 62: Plaintiff's Partial MSJ], and

---

[2] Only the Defendants against whom the Amended Complaint passed initial review are listed here. The Defendants' job titles are reflected as of the time of the incidents alleged in the Amended Complaint.

[3] This case was assigned to Judge Frank D. Whitney at that time.

2

Defendants have moved for summary judgment on all the Plaintiff's claims [Doc. 67: Defendants' MSJ].

The Court notified the Plaintiff of the opportunity to respond to Defendants' Motion and to present evidence in opposition pursuant to Fed. R. Civ. P. 56. [Doc. 70: Roseboro[4] Order]. The Plaintiff filed a Response to the summary judgment motion.[5] [Doc. 73: Plaintiff's MSJ Response]. The Defendants did not reply and the time to do so has expired. Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is

---

[4] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

[5] The Plaintiff addresses claims in his Response that did not pass initial review, including claims regarding the Americans with Disabilities Act, equal protection, unreasonable searches and confiscation of his personal property, interference with the mail, due process violations, and religious freedom. These claims are not properly before the Court and will not be separately addressed in this Order. See generally 28 U.S.C. § 1915(e)(2)(B) ("Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that … the action or appeal – (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."). The Plaintiff also includes new allegations in his Response that were not included in his Amended Complaint. [See Doc. 73: Plaintiff's MSJ Response at ¶ 20 (alleging that "retaliatory obstacles" are being imposed against the Plaintiff at his current prison "to forestall and deter the pursuit of Plaintiff's litigation against Defendants, by their peers/subordinates")]. Such claims are not properly before the Court and therefore will not be addressed further.

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or

arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. FACTUAL BACKGROUND

The parties' forecasts of evidence show the following, which is undisputed except as otherwise noted.

### A. Handicap Cell and Orderly Assistance

The Plaintiff has several health problems and is ADA assigned. [Doc. 69-4: Beaver Decl. Ex. A at 44, 45, 69, 71]. Prior to the events in question,

medical orders[6] were in effect at Alexander to provide the Plaintiff with orderly assistance and a handicap cell.  [Doc. 69-7: Fox Decl. Ex. A at 4; Doc. 69-4: Beaver Decl. Ex. A at 116].

The Plaintiff had spine surgery at Duke Regional Hospital on February 13, 2018.  The surgery included the placement of a titanium brace, screws, and a bone graft in the Plaintiff's neck which, the surgeon told the Plaintiff, would take at least six months to heal.  The Plaintiff recovered after the surgery at Central Prison for more than six weeks, before returning to Alexander on March 29, 2018.  [Doc. 15: Am. Complaint at 5; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 25].

Upon his return to Alexander, the Plaintiff was not provided a handicapped accessible cell or the assistance of an orderly.  [Doc. 73-1: Plaintiff's Decl. at ¶¶ 10, 14].  At that time, the Plaintiff's Medical Duty Status ("MDS") did not include active orders for a handicap cell or for orderly assistance; he was only required to be housed on a bottom bunk.  [Doc. 69-7: Fox Decl. Ex A at 6].

---

[6] While prison unit managers generally make cell assignments, for individuals with medical problems, the unit managers first consult with medical staff.  [Doc. 74-1: Am. Goins Decl. at ¶ 12].  The decision to require a handicap cell and the assistance of an orderly may only be made by a provider, i.e., a physician, a physician assistant, or a nurse practitioner.  [Doc. 74-2: Am. Fox Decl. at ¶ 22; Doc. 69-3: Beaver Decl. at ¶ 11].  If a medical provider decides that an orderly is necessary, the provider will put in an order to be implemented by the nursing staff and custodial staff.  [Doc. 69-3: Beaver Decl. at ¶ 11].

6

The Plaintiff alleges that the non-handicap cell was too small for the Plaintiff to turn around his wheelchair, and that the cell lacked grab bars or an electrical outlet for his breathing machine to treat COPD. [Doc. 15: Am. Complaint at 18]. Without orderly assistance, the Plaintiff was "forced to solicit assistance from certain inmates – who provide assistance at their convenience, so he is always at their mercy (often times, he has to forgo meals when he can't get help)." [Doc. 1: Complaint at ¶ 28].

The Plaintiff submitted sick call requests for a handicap cell and orderly assistance on April 3 and 5, 2018, and he was triaged by a nurse on both occasions. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 52; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 53]. The Plaintiff fell twice when he was getting up from the toilet because the non-handicap cell lacked rails. [Doc. 1: Complaint at ¶ 27; Doc. 73-1: Plaintiff's Decl. at ¶ 15]. The Plaintiff submitted sick call requests regarding the falls on April 6 and 7, 2018, and he was again triaged by a nurse on April 7 and 8, 2018. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 54; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 55; Doc. 69-4: Beaver Decl. Ex. A at 25].

The Plaintiff saw Christina Popst, R.N.,[7] about his falls and his requests for a handicap cell on April 21, 2018. [Doc. 73-3: Plaintiff's MSJ Response

---

[7] Popst was not named as a Defendant in this case.

7

Exhibits at 9].  Popst agreed that the Plaintiff required a handicap cell and orderly assistance and instructed the Plaintiff to talk with his unit manager about these accommodations.  [Id.].

The Plaintiff was moved to a handicap cell after his second fall.  [Doc. 73-1: Plaintiff's Decl. at ¶ 15].  At the times when orderly assistance was ordered for the Plaintiff, an orderly was assigned to the Plaintiff until the order expired.  [Doc. 74-2: Am. Fox Decl. at ¶ 22; Doc. 74-1: Am. Goins Decl. at ¶ 12].

### B.    Neck Brace

On March 30, 2018, the day after the Plaintiff returned to Alexander C.I., Goins noticed the Plaintiff wearing a neck brace.  [Doc. 74-1: Am. Goins Decl. at ¶ 8].  Goins was not aware of any surgeries or the need for a neck brace so he questioned the Plaintiff about the brace.  [Doc. 74-1: Am. Goins Decl. at ¶ 8].  Custodial staff does not make medical decisions, including unnecessarily taking medical equipment away from inmates, so Goins consulted with medical staff about the issue.  [Doc. 74-1: Am. Goins Decl. at ¶¶ 6, 8].  The Plaintiff "did not have an order for a neck brace and, in fact, the order said that the neck brace should be turned in."  [Doc. 74-2: Am. Fox Decl. at ¶ 15; Doc. 69-7: Fox Decl. Ex A at 8].  Medical staff told Goins that the Plaintiff did not have an order for the neck brace and that the Plaintiff

should be sent to the treatment room so that the situation could be addressed with medical staff members.[8]  [Doc. 74-1: Am. Goins Decl. at ¶ 8].  Later that day, Goins observed the Plaintiff wearing a second neck brace[9] and Goins instructed staff to bring the Plaintiff to the medical treatment room.  [Doc. 74-1: Am. Goins Decl. at 9].  Goins spoke with the captain on duty and the nurse supervisor after the Plaintiff expressed concerns about the issue.  [Doc. 74-1: Am. Goins Decl. at ¶ 9].  Because it was a holiday weekend with limited medical staff working, the decision was made to allow the Plaintiff to keep the second brace until medical could verify with the medical provider whether the brace was needed.  [Doc. 74-1: Am. Goins Decl. at ¶ 9].

## C.  Neurology Follow-up

The Plaintiff made several complaints of severe neck pain.  [Doc. 15: Am. Complaint at 15].  The Plaintiff was taken to Duke for a follow-up appointment with his surgeon on May 7, 2018, but the doctor refused to see him because no x-ray had been sent along with the Plaintiff as the doctor had instructed.  [Doc. 69-7: Fox Decl. Ex A at 10; Doc. 69-4: Beaver Decl. Ex A at 17].  According to Nurse Supervisor Fox, given the number of

---

[8] The Plaintiff asserts that Goins falsely stated that the brace was discontinued by the resident physician, Dr. Kalinski.  [Doc. 15: Am. Complaint at 20-21].  Dr. Kalinski is not named as a defendant in this action.

[9] The Plaintiff asserts that the second brace was a soft brace for sleeping. [Doc. 1: Complaint at ¶ 30].

9

inmates at Alexander, "there are times when inmates are not scheduled or inmates are sent to an appointment without necessary documents or chart material, but to the extent we had those lapses relating to Mohammed, it was never done deliberately, and appointments were rescheduled." [Doc. 74-2: Am. Fox Decl. at ¶ 19].

On May 11, 2018, an x-ray was taken of the Plaintiff's neck at Alexander, which revealed that there was hardware loosening in the Plaintiff's neck. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 21; Doc. 69-4: Beaver Decl. Ex. A at 94; Doc. 15: Am. Complaint at 5]. On May 14, 2018, with the x-ray results having been obtained, Dr. Kalinski ordered the rescheduling of the Plaintiff's appointment with the Duke doctor. She also ordered a CT scan if requested by the Duke doctor. Both of these items were designated as a "rush." [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 21; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 23].

The Plaintiff was scheduled to be transported to Central Prison for the CT scan on May 22, 2018, but he refused the trip. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 29]. The Plaintiff was transported to Duke for the follow-up appointment with his x-ray on May 24, 2018. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 30]. At 9:30 p.m. that same day, the Plaintiff saw Nurse Hart for complaints of pain and a loose screw in his neck. Nurse Hart

observed swelling and noted that the Plaintiff "refused two outside appointments this week concerning this problem," but that he was scheduled to see the provider because of the nature of the problem. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 57]. The Plaintiff believes that the loose hardware was caused by the confiscation of his neck brace. [Doc. 15: Am. Complaint at 21].

### D. Orthopedic Follow-up

Prior to the spine surgery, on February 15, 2017, the Plaintiff had seen an orthopedic specialist for a tear in his left shoulder. [Doc. 5: Am. Complaint at 15; Doc. 69-7: Fox Decl. Ex A at 2]. The orthopedist recommended a cortisone injection which the Plaintiff declined because an injection at his last appointment did not help. [Doc. 69-7: Fox Decl. Ex A at 2]. The orthopedist told the Plaintiff that he needed to undergo the spine surgery before considering any type of shoulder surgery and that the Plaintiff should follow up at the orthopedic clinic "only if he continues to have shoulder pain 6 months after his neck surgery." [Doc. 69-7: Fox Decl. Ex A at 2; Doc. 15: Am. Complaint at 5]. Because the Plaintiff's spine surgery had not yet been set, the six month follow-up appointment could not be scheduled at that

time.[10]  [Doc. 74-2: Am. Fox Decl. at ¶ 17].  The Plaintiff alleges that Nurse Johnson[11] "put in for follow-up" on May 29, 2018 but that the appointment was not scheduled.  [Doc. 15: Am. Complaint at 16; Doc. 1: Complaint at ¶ 23; Doc. 69-4: Beaver Decl. Ex. A at 94].

After the Plaintiff's neurological evaluation had been completed, Dr. Terri Byrd[12] placed a "rush" request for a follow-up with orthopedics for the Plaintiff's shoulder problem.  This was placed on April 2, 2019.  [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 24].

### E.    Migraine Treatment

The Plaintiff alleges that he suffers from severe migraine headaches due to a head injury.  [Doc. 15: Am. Complaint at 16].  The medical records presented by the Defendant indicate that the Plaintiff received Botox injections to treat his migraines at Eastern Carolina University Neurology ("ECU") on May 15, 2018, August 28, 2018, and November 3, 2018.  [Doc. 69-4: Beaver Decl. Ex. A at 93, 99, 105].

---

[10] The Plaintiff alleges that Fox and Chapman were responsible for scheduling outside appointments and failed to schedule his orthopedic follow-up even though they were fully aware of his need for the appointment, which would have been obvious to a layperson, and that this subjected him to continuous, and often severe, pain and suffering.  [Doc. 15: Am. Complaint at 16].

[11] James Johnson is not a Defendant is this case.

[12] Terri Byrd is not a Defendant in this case.

Sumatriptan medication was also prescribed for the Plaintiff on an as-needed basis. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 44]. No Sumatriptan was administered to the Plaintiff between August 2018 and February 2019. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 44-50].

The Plaintiff alleges that he was also prescribed medication for nausea which accompanied his headaches. [Doc. 15: Am. Complaint at 16]. He alleges, however, that the nausea medication was not issued after the Plaintiff returned from spine surgery, even though the order remained valid. [Id.]. The Plaintiff alleges that Chapman and Fox failed to ensure that the prescription treatment was administered, and that the denial of the prescription medication has subjected the Plaintiff to unnecessary pain and suffering. [Id.]. However, in a letter that the Plaintiff mailed to Beaver before the spine surgery, the Plaintiff stated that he "rarely take[s] [his] meds in fear of being poisoned." [Doc. 69-4: Beaver Decl. Exhibits at 117].

On January 29, 2019, the Plaintiff submitted a sick call appointment request asking why "several months' supply of certain meds not issued" and seeking refills of certain medications. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 58]. The Plaintiff was seen by a triage nurse on January 31, 2019, and he saw Nurse Eliphete Yacinthe[13] on February 8, 2019 for that

---

[13] Eliphete Yacinthe is not a Defendant in this case.

complaint. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 58; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 42-43]. Nurse Yacinthe provided counseling and the Plaintiff verbalized his understanding. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 42-43]. When the Plaintiff was transferred to Albemarle C.I. on May 7, 2019, three boxes of Sumatriptan 50 mg were transferred with him. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 51].

### F.   Transportation

The transportation of inmates is handled by officers in the transportation team, who have their own protocols for transporting inmates. [Doc. 74-1: Am. Goins Decl. at ¶ 13; Doc. 74-2: Am. Fox Decl. at ¶ 16]. Neither nurses nor the housing units have any control over how an inmate is transferred to medical appointments, or any input on the transportation officers' procedures. [Doc. 74-2: Am. Fox Decl. at ¶ 16; Doc. 74-1: Am. Goins Decl. at 23]. "When inmates are transported, they are required to be restrained unless a healthcare provider provides the inmate with a form indicating that the regular restraints should be modified." [Doc. 69-3: Beaver Decl. at ¶ 14]. When offenders are transported for medical appointments, "no personal property (including headgear) is permitted to be transported

other than personal care items such as glasses, hearing aids, etc." [Doc. 69-3: Beaver Decl. at ¶ 13; Doc. 74-1: Am. Goins Decl. at ¶ 13].

When the Plaintiff went on outside medical trips at Alexander, his personal property, including his prison ID card and religious headgear, was taken from him. [Doc. 1: Verified Complaint at ¶ 60; Doc. 73-1: Plaintiff's Decl. at ¶¶ 8, 9]. Without his religious headgear, the Plaintiff was cold during transportation because he is bald and the back of the van is not heated. The lack of an ID card during the Plaintiff's six-week recovery at Central Prison following his spine surgery rendered him unable to use the phone or mail to contact friends and family during that time, because phone calls and mail require a prison ID. [Doc. 73-1: Plaintiff's Decl. at ¶¶ 7, 8, 9].

Prior to his spine surgery, Plaintiff had an MDS to cuff him only in the front and to be provided a urinal for medical trips. [Doc. 69-7: Fox Decl. Ex A at 4; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 8]. However, when the Plaintiff returned to Alexander C.I. after the spine surgery, his MDS made no mention of cuffing or of providing a urinal during medical trips. [Doc. 69-7: Fox Decl. Ex A at 6].

On April 23, 2018, the Plaintiff wrote a letter to Chapman asking why the MDS's provisions for a urinal and transportation in a handicap van had

been removed and asking that these and other deleted provisions be reinstated. [Doc. 69-4: Beaver Decl. Ex. A at 11].

On May 22, 2018, the Plaintiff was scheduled for a spine CT scan at Central Prison. He refused the trip because the transportation officers refused to cuff him in front and to forego stacking of his wrists. [Doc. 73: Plaintiff's MSJ Response at ¶ 29; Doc. 73: Plaintiff's MSJ Response at 12; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 29]. The Plaintiff wrote a letter to Beaver on May 23, 2018 complaining that the transportation officer wanted to stack his wrists on May 22 and, when the Plaintiff complained, the officer checked with a lieutenant who said that nothing in the Plaintiff's file said that he could not be restrained with his hands stacked. [Doc. 69-4: Beaver Decl. Ex. A at 28]. The Plaintiff submitted a grievance on May 28, 2018, alleging that stacking for medical trips by "custody staff and medical staff" was cruel and unusual punishment. [Doc. 69-4: Beaver Decl. Ex. A at 37].

On May 29, 2018, the Plaintiff saw Nurse Johnson, who wrote an order to cuff front only and not to over adduct his arms. [Doc. 73: Plaintiff's MSJ Response at 13; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 25-26; Doc. 69-4: Beaver Decl. Ex. A at 94].

The Plaintiff's CT scan appointment at Central Prison was rescheduled on June 8, 2018, but the Plaintiff again refused. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 31]. The Plaintiff filed a grievance asserting that he refused to be transported because the transportation officer ignored the May 29 order about cuffing in front and stacking. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 27].

The Plaintiff was transported to ECU for migraine injections, a trip which takes approximately 12 hours, on May 15, August 28, and November 13, 2018. [Doc. 73-3: Plaintiff's MSJ Response Exhibits at 33, 35, 36]. On the August 28 trip, the Plaintiff was restrained in small cuffs and a waist chain and he did not have much room to move. [Doc. 1: Complaint at ¶ 35]. The Plaintiff repeatedly complained that it was too tight and that the cuffs caused bruises. [Id.]. On September 1, 2018, the Plaintiff requested larger cuffs for medical transport trips, but this request was denied because Plaintiff's weight and body mass index ("BMI") did not call for large cuffs. [Doc. 69-7: Fox Decl. Ex A at 15].

The Plaintiff wrote a letter to Beaver on September 4, 2018, complaining about his repeated problems with the transportation officer and that he was suffering from small restraints and uncomfortable conditions on

these 12-hour medical trips. [Doc. 69-4: Beaver Decl. Ex. A at 66; Doc. 62-4: Plaintiff's Partial MSJ Exhibits at 10].

The Plaintiff believes that stacking for the CT-scan appointments was done to conceal the extent of his injury from the loose hardware in his neck that was caused by staff actions and inactions. [Doc. 1: Complaint at ¶ 33; Doc. 73-1: Plaintiff's Decl. at ¶ 18]. While the Plaintiff asserts that he never refused any medical appointments (with the exception of lab work) [Doc. 73 at 14: Plaintiff's MSJ Response], the forecast of evidence before the Court establishes that the Plaintiff refused to be transported to medical appointments or to receive medical treatment on multiple occasions. [Doc. 74-2: Am. Fox Decl. at ¶¶ 13, 18; Doc. 69-8: Fox Decl. Ex B; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 39; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 15; Doc. 73-3: Plaintiff's MSJ Response Exhibits at 24].

### G.   Retaliation

The Plaintiff alleges that he was subjected to retaliation because he wrote a letter to Hooks after witnessing Goins and "his staff" use excessive force against a mentally challenged inmate on December 23, 2017, and for writing grievances and other correspondence about cell searches and inadequate medical care. [Doc. 1: Complaint at ¶ 22; Doc. 73-1: Plaintiff's Decl. at ¶ 6]. The allegedly retaliatory actions include: the denial of a

handicap cell and orderly assistance after the spine surgery; the confiscation of his neck brace; the confiscation of his religious headgear; repeated improper cell searches and property confiscation; alteration of his MDS; and transportation restraints in violation of doctors' orders. The Plaintiff asserts that these actions were deliberate and retaliatory. [Doc. 1: Complaint at ¶ 27]. The Plaintiff complained to Beaver, Chapman, Anderson, and Hooks about this alleged retaliation. [Id. at ¶ 22; Doc. 69-4: Beaver Decl. Ex. A at 11, 17, 29, 48].

The Defendants deny that the custodial and nursing staff retaliated against the Plaintiff in any way. [Doc. 74-1: Am. Goins Decl. at ¶ 14; Doc. 74-2: Am. Fox Decl. at ¶ 24; Doc. 69-3: Beaver Decl. at ¶¶ 15-17].

## IV.    DISCUSSION

### A.    Deliberate Indifference to a Serious Medical Need

The Plaintiff alleges that he has received insufficient medical treatment for his spine condition following surgery, for a tear in his left shoulder, and for migraine headaches.

To state a claim for deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko v.

19

Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Iko, 535 F.3d at 241 (internal quotation marks omitted).  To constitute deliberate indifference to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled on other grounds by Farmer v. Brennan, 511 U.S. 825, 825 (1994).

As to the Plaintiff's allegations that he did not receive proper medical treatment, the forecast of evidence before the Court reveals that the Plaintiff has received copious amounts of medical treatment for his neck condition, shoulder injury, and migraine headaches.  This includes surgery, injections, appointments with specialists, and medication.  The Plaintiff has failed to present a forecast of evidence that his treatment was inadequate, much less so grossly inadequate as to be the result of deliberate indifference.  Although the Plaintiff did not necessarily receive the treatment he wanted, when he wanted it, the medical records reveal that various medical providers and nursing staff responded to the Plaintiff's complaints and offered various treatments for each of his conditions, some of which the Plaintiff refused.

See Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("mere 'disagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances.").

That the care was not error-free or as prompt as the Plaintiff might have wished does not rise to the level of deliberate indifference to the Plaintiff's serious medical needs. See Miltier, 896 F.2d at 852 (mere negligence or malpractice does not violate the Eighth Amendment). For all these reasons, the Court concludes that the Plaintiff has failed to demonstrate the existence of a genuine issue of a material fact with regard to the medical care that he received at Alexander C.I. Therefore, the Defendants will be granted summary judgment as to this claim.

## B.    Conditions of Confinement

The Plaintiff alleges that he was exposed to unnecessarily harsh conditions of confinement including: the lack of a handicap cell and orderly assistance upon his return from spine surgery; confiscation of his religious headgear and prison ID for outside medical trips; and uncomfortable conditions of transportation.

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "Prison conditions may be harsh

and uncomfortable without violating the Eighth Amendment prohibition against cruel and unusual punishment." Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997). Rather, extreme deprivations are required, and "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation omitted)). Further, a plaintiff must allege and prove facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm. See Farmer, 511 U.S. at 847.

The uncontroverted forecast of evidence shows that the conditions the Plaintiff experienced during transportation to outside medical appointments were due to transportation officers' protocols over which unit and nursing staff had no authority. The Plaintiff has failed to forecast any evidence that the Defendants, none of whom are transportation officers, were responsible for the conditions of his transportation whatsoever. Therefore, the Defendants will be granted summary judgment on this claim.

With regards to the Plaintiff's claim that he was not placed in a handicap cell or provided an orderly after his spine surgery, the medical records presented by the Defendants demonstrate that no active order for such was in place when he returned from his surgery on March 29, 2018.

The Plaintiff admits that he was given a handicap cell after his second fall, which appears to have been on April 7, 2018 and, that by April 21, 2018, orders for a handicap cell and orderly assistance were in place. Although the record fails to demonstrate on which date the Plaintiff was provided an orderly, the Plaintiff admits that he was able to obtain some help from other inmates and he has not presented a forecast of evidence that the lack of an orderly was so serious that it deprived him of life's necessities or that any Defendant knew of, and deliberately disregarded, a risk of serious harm. Therefore, the Defendants will be granted summary judgment as to this claim.

### C.    Retaliation

The Plaintiff alleges that the Defendants retaliated against him for reporting staff misconduct and for filing grievances. He alleges that the retaliatory acts included: confiscation of his neck brace; denial of handicap cell and orderly assistance; uncomfortable transportation; alteration of his MDS; and harassing cell searches and confiscation of his personal property.

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000). Prison officials may not retaliate against an inmate for

exercising a constitutional right.  See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978).  In order to state a colorable retaliation claim under § 1983, a plaintiff must allege: "(1) [ ]he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct."  Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005)).  A plaintiff suffers adverse action if the allegedly retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  Id.  A plaintiff "must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to [his] exercise of First Amendment rights."  Constantine, 411 F.3d at 500 (quoting ACLU of Md., Inc. v. Wicomico Cnty., Md., 999 F.2d 780, 786 n.6 (4th Cir. 1993)).  A plaintiff's actual response to retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity.  Constantine, 411 F.3d at 500. In the prison context, retaliation claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct."  Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

The Plaintiff claims that the confiscation of his neck brace and the refusal to honor medical orders for a handicap cell and orderly assistance by officers were retaliatory. However, the uncontroverted forecast of evidence demonstrates that no active medical orders for a neck brace, handicap cell, or orderly assistance were in place at the time Plaintiff returned to Alexander C.I. following his spine surgery. Therefore, the Plaintiff's unsupported assertion that the failure of the Defendants to provide these items was retaliatory is not sufficient to create a genuine issue of material fact as to this issue. See generally Eastern Shore Mkt. Inc., 213 F.3d at 180; Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (defendant prevails on the "same-decision test" if it can show that it would have taken the same action in the absence of the plaintiff's protected conduct). Therefore, the Defendants will be granted summary judgment as to this claim.

The Plaintiff alleges that Defendant Harris ordered a cell search on December 21, 2017, and held him in the Treatment Room while the search was conducted by officers. However, in making this allegation, the Plaintiff merely states that "[i]t is believed" that Harris' actions were in retaliation for the Plaintiff's request for overhead headphones. Such speculation does not constitute a forecast of evidence to satisfy the summary judgment standard. [Doc. 15: Am. Complaint at 19]; Cottom v. Town of Seven Devils, 30 F. App'x

25

230, 234 (4th Cir. 2002) (granting summary judgment on plaintiffs' retaliation claim where plaintiffs failed to demonstrate that any action was taken against them in response to their complaints, and offered only speculation and hearsay in support of their claim). The Plaintiff's own filings indicate that the search was ordered to determine whether the Plaintiff already had headphones in his cell before issuing Plaintiff another set of headphones. [See Doc. 73: Plaintiff's MSJ Response at ¶ 39] (alleging that Harris stated in an interrogatory response that she requested officers to check Plaintiff's cell for headphones to determine the need for replacement equipment)]. The Plaintiff has failed to forecast any evidence that Defendant Harris directed a search of Plaintiff's cell for headphones in retaliation for his request for headphones or that she had any control whatsoever over the officers' method of conducting the search.[14] Further, this incident was a *de minimis* inconvenience and the foregoing would not deter a person of ordinary firmness from exercising his First Amendment rights. See Meeks v. Schofield, 625 F. App'x 697 (6th Cir. 2015) (several searches of inmate's work station and his one-time ejection from the law library were *de minimis*).

---

[14] Officers Duncan and Martin, who allegedly conducted the December 21, 2017 cell search, are not Defendants in this action. [See Doc. 1: Complaint at ¶ 37] (alleging that officers Duncan and Martin conducted the December 21, 2017 cell search).

Therefore, the Defendants will be granted summary judgment as to this claim.

The Plaintiff alleges that Defendants Goins and Snuffer subjected him to harassing searches and personal property confiscation in retaliation for the Plaintiff's complaints about staff misconduct and inadequate medical treatment. The Plaintiff complains *inter alia* that Defendants scattered his belongings and stepped on bags of cereal; that his religious headgear and ink pens were confiscated; and that some of the confiscated property was not properly inventoried and was never returned. The Plaintiff has not forecast evidence of anything more than *de minimis* inconvenience and the foregoing would not deter a person of ordinary firmness from exercising his First Amendment rights. See, e.g., Pope v. Bernard, 2011 WL 478055 (1st Cir. 2011) (inmate never had a disciplinary charge filed against him regarding possession of a confiscated Kufi and he had no privacy interest in his cell, therefore, "any claim based on the search of appellant's cell and the seizure of his Kufi can only be described as *de minimis*"); Zaire v. Coryer, 204 F. App'x 948 (2d Cir. 2006) (inmate alleged that prison officials took various retaliatory actions against him following an incident in a prison bathhouse; the alleged confiscation of his towel, even if true, was *de minimis*); Meeks, 625 F. App'x at 697 (several searches of inmate's work station and his one-

time ejection from the law library were *de minimis*).  This conclusion is supported by the record before the Court.  After all, the Plaintiff's grievances and letters written after these incidents demonstrate that he was not, in fact, deterred by the allegedly retaliatory searches and confiscation of property.  See Constantine, 411 F.3d at 500 (the plaintiff's actual response to retaliatory conduct provides some evidence of whether the conduct in question tends to chill First Amendment activity).  For instance, the Plaintiff submitted numerous grievances and letters after the seizure of his religious headgear on March 30, 2018 and the cell searches on May 11, 2018 and June 28, 2018.  [See Doc. 69-4: Beaver Decl. Ex. A at 11, 21, 25, 52].  Therefore, the Defendants will be granted summary judgment as to this claim.

Next, the Plaintiff alleges "on information and belief," that Defendants Harris and Fox altered his MDS in retaliation for his filing of grievances and making medical complaints.  [Doc. 15: Am. Complaint at 19; Doc. 1: Complaint at ¶¶ 40, 52].  Even verified allegations that are made "on information and belief" do not constitute a forecast of evidence to satisfy the requirements of Rule 56 and are insufficient to survive Defendants' Motion for Summary Judgment.  Cottom, 30 F. App'x at 234.  The uncontroverted forecast of evidence shows that no one in the nursing staff altered the

Plaintiff's medical duty status or otherwise retaliated against him. Therefore, the Defendants will be granted summary judgment as to this claim.

Finally, the Plaintiff claims that he was transported to medical appointments under conditions that were uncomfortable and retaliatory. However, the Defendants have established that unit and nursing staff are not involved in transportation protocols. [Doc. 69-5: Goins Decl. at ¶ 13]; [Doc. 69-6: Fox Decl. at ¶ 16]. None of the Defendants are transportation officers and the Plaintiff has failed to demonstrate that they caused the transportation conditions of which he complains. Therefore, the Defendants will be granted summary judgment as to this claim.

### D. Supervisory Liability

The Plaintiff concedes that Defendants Beaver, Hooks, Lassiter, and Plummer "did not directly participate in the violated acts." He argues, however, that they are nevertheless liable because they knew of the violations and failed to provide any relief. [Doc. 15: Am. Complaint at 14-15].

"It is well settled that 'supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)). A supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a

29

pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) there was an "affirmative causal link" between her inaction and the constitutional injury." Shaw, 13 F.3d at 799 (internal quotation marks omitted).

The Defendants have been granted summary judgment on Plaintiff's claims of deliberate indifference to a serious medical need, unconstitutional conditions of confinement, and retaliation. The Plaintiff's supervisory claims based on those violations, therefore, necessarily fail. Waybright v. Frederick Cty., MD, 528 F.3d 199, 203 (4th Cir. 2008) ("supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer," at least in suits for damages.") (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). Therefore, Defendants will be granted summary judgment on this claim.

### E. Plaintiff's Motion for Partial Summary Judgment

The Plaintiff has moved for partial summary judgment on his claims of unreasonable cell searches and the confiscation of personal property. These claims, however, did not pass initial review. As such, the Plaintiff's Motion for Partial Summary Judgment is moot.

## IV. CONCLUSION

For the reasons stated herein, the Court will deny the Plaintiff's Motion for Partial Summary Judgment [Doc. 62] and will grant the Defendants' Motion for Summary Judgment [Doc. 67].

## **ORDER**

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Partial Summary Judgment [Doc. 62] is **DENIED**; the Defendants' Motion for Summary Judgment [Doc. 67] is **GRANTED**; and this action is **DISMISSED WITH PREJUDICE**.

The Clerk is respectfully directed to terminate this action.

**IT IS SO ORDERED.**

Signed: March 25, 2021

Martin Reidinger
Chief United States District Judge